UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

CLEMON LINDSEY                                    CIVIL ACTION

VERSUS                                            NO: 05-1593

N. BURL CAIN, WARDEN                              SECTION: "K"(6)


REPORT AND RECOMMENDATION

This matter was referred to the United States Magistrate Judge for the purpose of conducting hearings, including an evidentiary hearing, if necessary, and submission of proposed findings and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C), and as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases. Upon review of the entire record, the court has determined that this matter can be disposed of without an evidentiary hearing. For the reasons set forth below, it is recommended that the instant petition be DENIED WITH PREJUDICE.

PROCEDURAL HISTORY

Petitioner, Clemon Lindsey, is a state prisoner currently incarcerated at the Louisiana State Penitentiary in Angola, Louisiana. After a trial by jury, Lindsey was convicted on February 5, 1998, of second-degree murder, a violation of La. R.S.

14:30.1.[1]  On April 3, 1998, Lindsey filed a motion for judgment of acquittal and for a new trial based on newly discovered evidence.  The district court denied the motion[2] and sentenced Lindsey to life without benefit of parole, probation or suspension of sentence.[3]  Lindsey appealed, challenging the district court's denial of his motion for new trial based upon newly discovered evidence and requesting a review for errors patent.  The Louisiana Court of Appeal, Fourth Circuit, affirmed on March 22, 2000.[4]  Petitioner then filed a request for writ of certiorari with the Louisiana Supreme Court, which was granted on February 2, 2001.  The Court reversed the decision of the Louisiana Fourth Circuit Court of Appeal and remanded the case to the state trial court for an evidentiary hearing on Lindsey's motion for new trial.[5]  In compliance with the Louisiana Supreme Court's Order, the state trial court conducted an evidentiary

---

[1]*See* State Rec. Vol. 1, Minute Entry and docket entry dated 2/05/98, Orleans Parish Criminal District Court, Case # 388-564 "K".

[2]*See* State Rec. Vols. 1-3, each containing a copy of the motion for post-verdict judgment of acquittal or, in the alternative, for a new trial. State Rec. Vol. 2 also contains a copy of the intermediate appellate court's denial of writ 98-K-1601.  *See also* Minute Entry dated 4/03/98.

[3]*See* State Rec. Vol. 1, Minute Entry dated 4/03/98; State Rec. Vol. 2, Transcript of Sentencing dated 4/03/98 at p. 7.

[4]*See* State Rec. Vol. 1, Minute Entry dated 3/22/00.  A copy of the appeal writ can be found at State Rec. Vol. 2 and a copy of the decision can be found at State Rec. Vol. 2 or at *State v. Lindsey*, 758 So.2d 916 (No. 99-KA-0188)(La. App. 4th Cir. 3/22/00).

[5]*See* State Rec. Vol. 5 for a copy of writ application in 2000-K-1171 filed on April 25, 2000 and denied on February 2, 2001. *See also State v. Lindsey,* 783 So.2d 377 (La. 2/02/01).

hearing on petitioner's Motion for a New Trial and subsequently denied the motion.[6]

Lindsey then filed a writ application[7] with the Louisiana Fourth Circuit Court of Appeal, and the Court granted the writ in part on August 22, 2001.[8]  The Court ordered the state trial court to grant petitioner an appeal and to set a return date.[9]  The state trial court appointed the Louisiana Appellate Project to represent Lindsey,[10] but the record is unclear as to whether the motion for appeal was granted.

Petitioner next filed an application for post-conviction relief on February 24, 2003,[11] and the state trial court denied the application on May 16, 2003.[12]  Petitioner filed an Application for Writ of Review to the Louisiana Fourth Circuit Court of Appeal on August 29, 2003.[13]  The Louisiana Fourth Circuit Court of Appeal granted

---

[6]*See* State Rec. Vol. 1, Minute Entry dated 4/05/01. See also the discussion of the hearing on the motion for new trial at footnote 35 herein.

[7]Docket number 2001-K-1369.

[8]*See* State Rec. Vol. 1. or Vol. 2 for a copy of that decision, *State v. Lindsey*, (Writ No. 2001-K-1369) (La. App. 4th Cir. 8/22/01).

[9]*See* State Rec. Vol. 1.

[10]*See* State Rec. Vol. 1, Minute Entry dated 9/04/01.

[11]*See* State Rec. Vol. 1 for a copy of the application.  The State's response indicates that a second identical post-conviction application was filed on July 23, 2003, however, a copy of that writ application could not be located in the state court record by this court.

[12]*See* State Rec. Vol. 1 for the decision of the state trial court. See also State Rec. Vol. 2, Letter from the Orleans Parish Criminal District Court, Law Clerk to Judge Hunter, dated May 16, 2003.

[13]*See* State Rec. Vol. 5, Writ No. 2003-K-1547.

the writ in part, and ordered the state trial court to conduct a hearing on the status of the petitioner's appeal.[14]

On January 14, 2004, Lindsey filed an application for writs to the Louisiana Fourth Circuit Court of Appeal requesting the status of his application for post-conviction relief.[15]   In that application, petitioner stated that he had requested that his appeal be dismissed and that the court had written him and informed him by letter dated December 15, 2003, that his appeal had been dismissed.[16] The Louisiana Fourth Circuit denied this writ application on February 19, 2004, stating it found no error in the state trial court's denial of the application for post-conviction relief.[17]

Petitioner then filed for supervisory writs with the Louisiana Supreme Court under docket number 04-KH-0736 on March 23, 2004.  The Court denied the writ on February 18, 2005.[18] Lindsey filed another writ application with the Louisiana Fourth Circuit Court of Appeal on November 8, 2004.  The Louisiana Fourth Circuit denied

---

[14]*See* State Rec. Vol. 2 or 5, for a copy of the decision in *State v. Lindsey*, Writ No. 2003-K-1547 (La. App. 4th Cir, 9/24/03).

[15]*See* State Rec. Vol. 5, Writ number 2004-K-0081.

[16]*See* State Rec. Vol. 5 for a copy of petitioner's letter.

[17]*See* State Rec. Vol. 5, *State v. Lindsey*, Writ No. 2004-K-0081 (La. App. 4th Cir. 2/19, 2004).

[18]*See* State Rec. Vol. 1, for a copy of the decision in *State ex rel. Lindsey v. State*, 896 So.2d 21 (La. 2/18/05).

that writ on January 5, 2005 as repetitive and without merit.[19]  The Petitioner then

sought a supervisory writ to the Louisiana Supreme Court under docket number 2005-

KH-0689, which was denied on January 27, 2006.[20]

The instant habeas petition was filed on or about March 23, 2005, the

date Lindsey signed his federal petition.[21]  However, the petition was deemed deficient

and Lindsey was ordered to supplement his brief.[22]  Said supplement was filed by

Lindsey on May 13, 2006.[23] The State filed its initial response on July 22, 2005,[24] to

which Lindsey filed a traverse on August 10, 2005.[25] Lindsey then filed a second

---

[19]*See* State Rec. Vol. 1 or Vol. 5 for a copy of the writ denial, Writ No. 2004-K-1928.

[20]*State ex rel. Lindsey v. State*, 922 So.2d 529 (La. 2006).

[21]This March 23, 2005, filing date was ascertained via the Court's use of the federal
"mailbox rule."  Under this rule, a pleading filed by a prisoner acting *pro se* is considered to be
filed for prescriptive purposes on the date it is delivered to prison officials for mailing, rather
than the date it is received by the court.  *Cooper v. Brookshire*, 70 F.3d 377, 379 (5th Cir. 1995).
Generally, the date a prisoner signs his petition is presumed to be the date he delivered it to
prison officials for mailing.  *See Colarte v. Leblanc*, 40 F.Supp.2d 816, 817 (E.D. La. 1999)
(assumed that petitioner turned his *habeas corpus* application over to prison officials for delivery
to this Court on the date he signed his application); *Magee v. Cain*, 2000 WL 1023423, *4 n.2
(E.D. La. 2000) (inferred that filing date and signature date of habeas petition were the same);
*Punch v. State* , 1999 WL 562729, *2 n.3 (E.D. La. 1999) (may reasonably be inferred that
prisoner delivered habeas petition to prison officials for mailing on date he signed petition).

[22]*See* Fed. Rec. Doc. 3.

[23] *See* Fed. Rec. Doc. 4.

[24]*See* Fed. Rec. Doc. 14.

[25]*See* Fed. Rec. Doc. 15.

supplemental petition on March 15, 2006,[26] to which the State filed a supplemental response on September 29, 2006.[27] In the State's supplemental response, the State conceded that Lindsey's federal petition was timely filed. Lindsay subsequently filed yet another traverse to the State's supplemental response  as well as a motion for appointment of counsel, which was denied on July 20, 2007.[28]

Upon review of the state court record submitted, the court determined that certain documents and a transcript regarding petitioner's motion in the state trial court for a new trial were missing from the record.   Therefore, on August 26, 2008, the State was ordered to provide the missing documents to the court or provide a written response indicating that the document was unavailable.   Five extension requests followed, filed by the State, requesting additional time to comply with the court's order for various reasons, not the least of which was because the state record had been significantly damaged in Hurricane Katrina and had to be hand-copied one page at a time due to the brittle state of the documents.[29] The State subsequently filed a notice of compliance, detailing the additional documents which had been provided and those

---

[26]*See* Fed. Rec. Doc. 17.

[27]*See* Fed. Rec. Doc. 31.

[28]*See* Fed. Rec. Docs. 32, 33 and 34.

[29]*See* Fed. Rec. Doc. 41.  *See also* Fed. Rec. Docs. 37, 39, and 45 relative to the additional extension requests.

that could not be provided.[30]

<h2 align="center">BACKGROUND FACTS[31]</h2>

Debra Baptiste,[32] the victim's ex-wife, stated that she and the victim had been divorced but were planning to remarry. Debra acknowledged that she dated the defendant for a few months after she divorced the victim. On 15 December 1996, she and the victim were sitting outside her daughter's residence talking to a friend, Aaron Clark, her brother, Hosea, and Hosea's girlfriend (and defendant's sister), Gwen. At approximately 10:15 p.m., the defendant stopped his vehicle and approached the group. The victim and Hosea were joking with each other. Debra had asked Tara, her daughter, to come outside because she thought Hosea was trying to instigate trouble. When Tara came outside, Hosea and Gwen were leaving. The victim was talking to Aaron Clark. Shortly thereafter, Aaron decided to go inside. As he was leaving, the defendant stated that "he'll take somebody out." The victim asked the defendant "What are you talking about?" The defendant then grabbed the victim and shot him. The victim was unarmed and did not threaten the defendant. After the victim was on

---

[30]*See* Fed. Rec. Doc. 47.

[31]The facts are adopted from the state appellate opinion in *State v. Lindsey*, 758 So.2d 916 (La. App. 4th Cir. 2000), after this court conducted an independent review of the record.

[32]Debra Baptiste is sometimes referred to instead as "Deborah" either in the state record or in petitioner's pleadings. Also the name "Baptiste" can occasionally be found in the record as "Batiste".

the ground, the defendant stepped over the victim, shot him again, and walked to his car. Debra ran to Tara's apartment and called the police. She stated that while the victim had used cocaine in the past, she did not know if he was high that night. She testified that he was not drunk. The witness admitted to prior convictions for battery and negligent injury that arose out of a domestic dispute.

Aaron Clark testified that he passed by Law Street on 15 December 1996. When he saw the victim and his ex-wife standing outside, he stopped to visit with them. Hosea, Gwen and the defendant were outside with the victim and his ex-wife. Hosea and the victim were joking around. After Hosea and Gwen decided to leave, he decided to leave. As he walked to his car, he heard the defendant and the victim in a heated argument. When he heard gunshots, he ducked and turned around. The witness saw the defendant holding a gun. The victim stumbled into the street. Debra Baptiste yelled, "Stop, please don't shoot him no more." Clark stated that the victim was not armed and did not appear to be intoxicated.

Tara Baptiste, the victim's daughter, testified that on 15 December 1996, she lived at 1862 Law Street. She had seen the defendant earlier that day near her house. Tara stated that she and her sister stopped to talk to the defendant. The defendant told them that someone had shot up his vehicle the night before. The defendant took a gun out of his pants and said he was going to get the person who shot his car. The

defendant did not mention the witness' father. Later that night around 10:15 p.m., Tara was at home playing cards with her younger brother. Her mother, who was outside with her father, sent a young boy to call Tara outside. When Tara went outside, she saw the defendant. The defendant was telling his brother, Gary, to move his vehicle. Tara spoke with her mother. Tara's father approached Tara and gave her a hug. Tara's younger brother and her neighbor, Aaron, came outside at the same time. Tara's father told her that he and her uncle were joking and that Tara's mother was upset. Tara told her mother that they should stop "clowning around." The defendant asked Tara "What's up Tee?" Tara said "nothing." The defendant then told her that "nothing's going to happen out here tonight." Tara walked back to her apartment. As she reached the door, she heard four gunshots and her mother yelling that the defendant shot her father. Tara ran back toward the street and saw her father lying in the street. Tara testified that when she went outside she saw that the defendant had a gun in his waistband. She stated that her father was not armed. Tara acknowledged that her father used drugs. She further testified that her father was not high or drunk that night. Tara stated that her mother had dated the defendant for a short time after her mother and father divorced.[33]

---

[33]The court could not independently review the trial transcript of Tara Baptiste's testimony as there are pages missing from the record. (See State Rec. Vol. 4, Trial Transcript, missing pages 25-48). However, the testimony of Tara Baptiste is not challenged by petitioner thus there was no reason to order the state to file yet another supplement to the state court record.

Leroy Baptiste, Jr., the victim's son, was playing cards with his sister, Tara, at her house on the evening of the shooting. Their mother asked him and Tara to go outside. Tara's mother said that his uncle was trying to start a fight with his father. When he went outside, he noticed the defendant, Tara, his mother, his father, his uncle Hosea and Hosea's girlfriend, Gwen, standing near the street. Their neighbor, Aaron Clark, was also outside. There was no argument between his uncle and his father. They had been kidding with each other. Leroy stated that he went back inside about five minutes later. While inside, he heard four gunshots. Leroy then ran outside and saw that his father had been shot. He acknowledged that his father used cocaine. The witness stated that his father did not own or possess a weapon. Leroy admitted to a conviction for possession of a stolen car and possession of a stolen weapon. The offenses occurred in June and July of 1997, after his father was killed.

Detective Arthur Kaufman testified that he took a statement from Debra Baptiste at approximately 11:30 p.m. on 15 December 1996. She stated that the defendant and the victim had an argument over another woman. She told the officer a physical altercation occurred between the defendant and the victim.

Detective Richard Williams, the lead homicide investigator, arrived on the scene after the victim had been transported to the hospital. Detective Williams testified that he spoke with several witnesses, including Hosea Reine and Leroy

Baptiste, Jr., and took statements from Debra Baptiste and Aaron Clark. The witnesses indicated that there had been a verbal altercation between the two men but that the victim was unarmed. Detective Williams also prepared photographic lineups which included the defendant's photograph and showed them to Debra Baptiste and Aaron Clark. Baptiste and Clark identified the defendant as the person who shot the victim.

Dr. Susan Garcia, a forensic pathologist, performed an autopsy on the victim. Dr. Garcia testified that the victim died from four gunshot wounds to the chest, abdomen and side. The two most lethal injuries were to the victim's chest and shoulder area. One bullet entered above the left nipple and injured both lungs, heart and liver. Another bullet entered near the right shoulder and injured the right lung. Two bullets were recovered during the autopsy. The victim had a blood alcohol level of .26. Cocaine was also found in the victim's body.

Officer Luther Randall processed the crime scene. He photographed the scene and collected four Winchester .380 automatic spent casings and one pair of slippers. Officer Kenneth Leary examined the four casings found on the scene and the two bullets recovered during the autopsy. Officer Leary testified that the four casings were fired from the same weapon. The two bullets recovered during the autopsy were fired from the same weapon.

Officer Herman Franklin investigated a shooting which occurred the night

before, on 14 December 1996, at approximately 3:25 a.m. The defendant called the police after someone shot at his vehicle. The officer noted there were bullet holes on the driver and passenger's side doors. The defendant told the officer that "Paul Brady" shot up his car.[34]

The defendant, Clemon Lindsey, testified on his own behalf. He stated that he had dated Debra Baptiste for a couple of years. He did not know she and the defendant were getting back together at the time of the shooting. On 14 December 1996, the defendant went to the Sand Pit, a club on St. Claude Avenue, with his brothers and their friends. At approximately 12:00 a.m., the defendant's brother, Troy, and his girlfriend, Evelyn, decided they were ready to go home. The defendant decided to leave at the same time. As the defendant was walking to his car, someone started shooting at him. The defendant jumped into the driver's side and his brother, Tyrone, got in the passenger side of his vehicle. The defendant drove off as fast as possible. The defendant recognized Paul Bailey with four other men. The defendant went to his mother's house and called the police. An officer came out, and a report of the shooting was made. After the police left, the defendant saw Leroy Baptiste, Paul Bailey and

---

[34]Once again, the state record is missing trial transcript pages 95-116, which includes the testimony of Detective Williams, Officer Norton and Officer Franklin. Pages 95-97 of the trial transcript appear elsewhere in the record, see State Rec. Vol. 1 or 5. Although the court could not independently review those pages of the trial transcript , none of the testimony contained therein is challenged by petitioner. Detective Williams did testify at the motion hearing held on June 20, 1997 and a copy of that transcript is located in State Rec. Vol. 4.

three other men in a vehicle near his mother's house. They yelled for the defendant to come out of the house. The defendant left the house through the back door.

The next day, the defendant went to Plaquemines Parish to work on a vehicle. After defendant got home, he went to his brother's house on Law Street. When the defendant returned home, he received a phone call from his sister, Shawanda, asking the defendant if she could borrow money to purchase diapers and Tylenol. The defendant told his sister that he would see if Troy would bring the money to her because he was afraid to go into that area. Shawanda lived in the same apartment complex as Tara Baptiste. Leroy Baptiste had told the defendant he would kill the defendant if he caught the defendant with his wife. However, the defendant picked up his friend, Rodney Caesar, and took the money to his sister. As the defendant was leaving the apartment complex, the victim saw the defendant and made derogatory remarks to him. The victim was armed and with Paul Bailey. The defendant told the victim he did not want any trouble. The victim started beating the defendant with the gun and kicking the defendant in the abdomen. Debra Baptiste came outside and told the victim to stop beating the defendant. The victim then hit Debra and knocked her down in the street. The victim said he was going to kill the defendant. The defendant took his gun out of his pocket and shot the victim. The defendant ran to his car and drove off.

On cross examination, the defendant admitted to convictions for hit and run, negligent injury and attempted simple kidnapping.

Shawanda London, the defendant's sister, testified that in December 1996, she and her husband, John London, lived at 1860 Law Street. Tara Baptiste lived in the same complex. London stated that she did not see the shooting. She had called her brother earlier that evening about borrowing money. When he took the money to her, he told her that someone had shot up his car. After the defendant left, she went to sleep. London testified she was sleeping at the time of the shooting.

John London, Shawanda's husband, was in bed when he heard the gunshots. He ran outside and heard Debra screaming "They killed Leroy." He returned inside and called 911. London testified that the victim used cocaine and had a violent temper. On cross examination, the witness acknowledged prior convictions for aggravated battery, simple battery and unauthorized entry of an inhabited dwelling.

Rodney Caesar testified that he went with the defendant to his sister's house on the evening of 15 December 1996. After the defendant parked his car, Caesar walked to the store while the defendant went to his sister's house. When Caesar came back from the store, he saw a guy lying in the street. Caesar stated that he saw a woman pick up a gun and take it inside an apartment.

On rebuttal, Det. Williams testified that he spoke with Shawanda London a couple of days after the shooting. Ms. London told the officer that the defendant lived on Touro Street with his girlfriend. Ms. London stated that she did not see the shooting. She was sleeping at the time of the shooting. She further told the officer that she had last seen her brother a couple of days before the shooting. She did not tell Detective Williams that she saw the defendant on the day of the shooting.

Officer Terry Mercedal conducted the follow-up investigation of the shooting on 14 December 1996. The officer compiled a photographic lineup including Paul Bailey's photograph and attempted to show the lineup to the defendant. However, the defendant refused to view the lineup. At no time did the defendant mention the victim's name.[35]

---

[35]To give a more full account of the history of Lindsey's case, the court notes the following:

After the petitioner was convicted, he filed a motion for new trial with the trial court based upon "newly discovered evidence" which he presented through the affidavit of Earnestine Taylor. In the affidavit, Taylor stated that she had lived in the apartment complex located at 1860 Law Street on the date of the shooting. She claimed that she was entering her apartment at the time of the shooting and saw the defendant and the victim involved in an argument. She reported that she saw the victim strike the defendant with a gun and knock the defendant to the ground. The victim then began kicking the defendant in the side. She then saw the victim point his gun at the defendant. At the same time, the defendant pulled out his gun. The shooting started, and she ran inside. She stated that she heard six shots. She did not go outside until an ambulance arrived. Taylor stated in her affidavit that Debra Baptiste later asked her to lie about what she saw. When Taylor refused to do so, she began receiving threats from the Baptiste family. She moved out of the apartment complex one month after the shooting because of the threats she had received. Taylor swore that she was giving her statement freely, voluntarily and without being promised anything or threatened by anyone. Ms. Zena Bienemy witnessed the affidavit.

## STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") includes a comprehensive overhaul of federal habeas corpus legislation, including 28 U.S.C. § 2254. Amended subsections 2254(d)(1) and (2) contain revised standards of review for questions of fact, question of law, and mixed question of law and fact. Provided that the state court adjudicated the claim on the merits, pure questions of law and mixed question of law and fact are reviewed under § 2254(d)(1) and questions of fact are reviewed under § 2254(d)(2); *Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir.

---

The trial judge denied the motion for new trial without a hearing, a decision that was upheld by the state appellate court on direct appeal. Subsequently, however, the Louisiana Supreme Court remanded the matter to the trial court for a hearing to be held. The transcript of that hearing was unavailable to this court until the State's recent supplement was filed.

At the hearing, held on April 5th, 2001, Earnestine Taylor recanted the story she had relayed in her prior affidavit. Ms. Taylor indicated that she "didn't really recall" signing the affidavit because she was "being threatened by so many people", including both the petitioner's family and the victim's family. Ms. Taylor indicated that she was young and afraid with two children at the time of the crime. She stated that she lied in her affidavit and did not witness the crime. She also reported that Clemon Lindsey was her boyfriend at the time and that immediately after the crime occurred, someone told her, "Oh, your boyfriend done killed somebody." She denied that her current husband had told her in front of the defense's investigator not to say anything about what had happened between Lindsey and the victim.

The defense also called Ms. Zena Bienemy to testify at the motion for new trial. Ms. Bienemy indicated that she had previously witnessed the affidavit of Ms. Taylor, that no one had threatened or offered money to Taylor to coerce her into giving her statement, and that Ms. Taylor did not appear intoxicated nor under duress when she signed the affidavit.

At the conclusion of these proceedings, the trial judge denied the motion for new trial. *See* State Rec. Vol. 3, supplemental, for a copy of the transcript of the motion for new trial.

2000).

As to questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision unless it "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). The United States Supreme Court has noted:

> § 2254(d)(1)'s "contrary to" and "unreasonable application" clauses have independent meaning. A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts. The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case. The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in *Williams [v. Taylor*, 529 U.S. 362 (2000)] that an unreasonable application is different from an incorrect one.

*Bell v. Cone,* 535 U.S. 685, 694, 122 S.Ct. 1843, 1850, 152 L. Ed.2d 914 (2002) (citation omitted).

As to questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. §2254(d)(2); *see also Hill*, 210 F.3d at 485; 28 U.S.C. §2254(e)(1).

## CLAIM #1:  SELECTION OF GRAND JURY

## AND GRAND JURY FOREPERSON

In his federal habeas corpus petition, Lindsey alleges that he was indicted for second degree murder by an Orleans Parish grand jury in 1997 and that the indictment should have been quashed as illegal.  He argues that there are three reasons that the indictment should have been quashed:  1) race and gender discrimination in the selection of the grand jury foreperson; 2) the grand jury was selected pursuant to impermissible local laws; and,  3) qualified individuals were improperly excluded as ineligible to serve on the grand jury.  The state's response indicates only that petitioner should be procedurally barred from raising his challenge to the grand jury and/or grand jury foreperson because petitioner failed to file a pre-trial motion to quash, as required under state law.[36]  This fact appears true from the record, as no motion to quash was found nor was one apparently argued before the state district court.  However, as the state has been informed many times in the past opinions of this court,  "[t]he mere fact that a federal petitioner failed to abide by a state procedural rule does not prevent a federal court from resolving a federal claim unless the state court actually relied on the state procedural bar "as an independent basis for its disposition of the case." *Harris v.*

---

[36] *See* La. C. Cr. P. art. 535, which requires that a motion to quash be filed prior to commencement of trial. See also *Deloch v. Whitley*, 684 So.2d 349 (La. 1996).

*Reed*, 489 U.S. 255, 261-262, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989) (internal quotation marks omitted). Moreover, where a state appellate court's decision is silent as to the basis for its decision but upholds an earlier decision relying on a state procedural bar, the court generally applies a presumption that the last reasoned opinion was relied upon by the later judgments of the higher state courts. See *Ylst v. Nunnemaker*, 501 U.S. 797, 111 S.Ct. 2590, 115 L.Ed. 2d 706 (1991). Unfortunately, in this case, the issue of discrimination in the selection of the grand jury and/or of grand jury forepersons was first raised in post-conviction proceedings filed before the state district court on or about February 24, 2003 and again on May 13, 2004.[37] That court denied the claim without written reasons.[38] The state appellate court reviewed the lower court decision and ruled, "The court finds no error in the judgment of the district court denying relator's application for post-conviction relief."[39] The Louisiana Supreme Court reviewed the discrimination in selection of the grand jury/grand jury

---

[37]State Rec. Vol. 1, supplemental.

[38]In fact, there is no written Judgment in the record signed by the Honorable Arthur Hunter denying petitioner's post-conviction claims. All that exists in the record is a minute entry indicating that the post-conviction application submitted May 13, 2004 was denied by the court (State Rec. Vol. 1, supplemental) and a letter from Judge Hunter's law clerk to petitioner stating that the post-conviction pleadings filed February 24, 2003 and again on May 13, 2004 had been denied (State Rec. Vol. 2, letter dated October 6, 2004.)

[39]State Rec. Vol. 5 of 6, ruling in Writ No. 2004-K-0081. See also State Rec. Vol. 1 or State Rec. Vol. 1, supplemental, for ruling in Writ No. 2004-K-1928 where the state appellate court found petitioner's second PCR repetitive of Writ No. 2004-K-0081 but also denied the writ with a finding that the trial court had not erred.

foreperson claim and simply ruled, "Denied". None of the state courts specifically relied upon Lindsey's failure to timely file a motion to quash as a basis for its decision to deny relief, thus there is no last reasoned opinion to which this court can defer. Accordingly, the State cannot now rely upon petitioner's failure to file a motion to quash as a procedural bar to the claims raised before this court. *Harris*, 489 U.S. at 261-262.

In pursuing his claim that the grand jury forepersons were selected in a discriminatory fashion, petitioner specifically relies on the state *district* court case of *State v. Fleming* as authority for his claim. In that case, Orleans Parish Criminal District Court No. 401-182, Section "K", the Honorable Arthur L. Hunter quashed an Orleans Parish grand jury indictment based upon a finding that the defendants had presented, and the State had failed to rebut, a prima facie cases of discrimination in the selection of grand jury forepersons in Orleans Parish between the years 1987 and 2000, all in violation of the 14th Amendment. The trial court also found that the grand juror selection process set forth in La. C.Cr. P. art. 413(C) was a local or special law which violated La. Const. Art. III, §12.[40]

The state directly appealed the ruling in *Fleming* to the Louisiana Supreme

---

[40]The state district court case is discussed in the opinion issued by the Louisiana Supreme Court <u>vacating that decision</u> in *State v. Fleming*, 820 So.2d 467 (La. 2002).

Court, as said court had jurisdiction to consider a case where a law or ordinance has been declared unconstitutional on its face without an appeal being first filed at the lower appellate court. *See* Article V, §5(D)(1) of the Louisiana Constitution.  The Louisiana Supreme Court, however, found that the trial court was premature in addressing the constitutionality of the statute on its face and vacated the decision, transferring the case to the Louisiana Fourth Circuit Court of Appeal to be treated as an appeal by the State.

The Fourth Circuit ultimately reversed and remanded the decision of Judge Hunter.  The appellate court, setting forth the appropriate U.S. Supreme Court standard as pronounced in *Castaneda v. Partida*, 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977), found as follows:

"[A] prima facie showing of purposeful discrimination is established by proving 'over a significant period of time' that 'substantial under-representation' has occurred of a 'recognizable distinct class, singled out for different treatment under the laws' (citations omitted). . . One method of establishing such purposeful discrimination is by satisfying the following three-prong test:

1. Those alleged to be discriminated against belong to an identifiable group in the general population.

2.  The selection process is subject to abuse according to subjective criteria.

3. The degree of under-representation, as shown by comparing the proportion of the group at issue found in the general population to the proportion called to serve."

*State v. Fleming*, 846 So.2d 114, 120 (La. App. 4th Cir. 2003), citing *Castaneda*, *supra* (other citation omitted). After applying the *Castaneda* analysis to the facts before the court, the state appellate court found that the first two elements were satisfied. However the court found that the motion to quash was wrongfully granted as the defendants had failed to make a statistical showing of substantial under-representation over a substantial period of time. The case was therefore reversed and remanded to the trial court.[41]

Such was the end result of the state district court's case in *Fleming*, the case petitioner relies upon in support of his claim. Lindsey offers no independent statistical evidence or other evidence to support discrimination in the selection of grand jury forepersons in his case other than that he "adopts" the statistical data and the reasoning

---

[41]The state appellate courts which reviewed the evidence offered to prove under-representation in the *Fleming* case noted that the evidence submitted was incomplete as the racial and gender identity of six grand jurors during the relevant time period were unknown. *See Fleming*, 846 So.2d at 122; and, *State v. Fleming*, 846 So.2d at p. 119 n.2. It was known that at least ten African-American and 11 female forepersons out of a total of twenty-five known grand jury forepersons had been selected over a thirteen year period. *Id.* Additionally, the evidence established that between 1987 and 2000, white judges had selected whites as forepersons 74% of the time and blacks as forepersons 26% of the time and black judges had selected blacks as forepersons 83% of the time and whites as forepersons 17% of the time. Blacks comprised 58% of the registered voters in Orleans Parish during the relevant time period Moreover, male judges selected males as forepersons 64% of the time and females 36% of the time even though males comprised only 43% of registered voters in Orleans Parish.

of the trial court's written ruling in the *Fleming* case -- data that was ultimately found deficient and reasoning that was ultimately rejected by the higher state courts in *State v. Fleming*, 820 So.2d 467 (La. 2002) and in the subsequent decision in *State v. Fleming*, 846 So.2d 114 (La. App. 4th Cir. 2003). Clearly, Lindsey's reliance upon the state district court's reversed and vacated decision is misplaced.

Moreover, based upon the statistics offered, this court is in agreement with the state appellate court's reasoning in *Fleming*, 846 So.2d 114, that the evidence does not establish substantial under-representation. The burden is on petitioner to establish, as part of his *prima facie* case, substantial under-representation. *Castaneda*, 430 U.S. 482. The evidence submitted in the *Fleming* case showed that a total of thirty-one forepersons were chosen during the relevant thirteen year period, of which the race and gender of six grand jury forepersons were unknown. As the state appellate court found in *Fleming*, the "[d]efendants' statistical evidence was flawed because it was drawn from incomplete data . . . it is quite possible that 'the missing data could prove no disparity at all in the race and gender of the forepersons." *Fleming*, 846 So.2d 122. In other words, if out of those thirty-one grand jury forepersons, there were sixteen African-Americans (10 known to be African-American and 6 whose race was unknown but potentially African-American), then more than 51.6 percent of the grand jury forepersons could have been African-American. Since blacks comprised 58

23

percent of the registered voters at that time, the absolute statistical disparity would be less than 7 percent. Although the Supreme Court "has never announced mathematical standards for the demonstration of systematic exclusion of blacks," see *Rideau v. Whitley*, 237 F.3d 472, 487 (5th Cir. 2000)(citations and internal quotations omitted) the U.S. Fifth Circuit has found that absolute disparities of 10 percent or less are insufficient to warrant relief. See *Mosley v. Dretke*, 370 F.3d 467, 479 (5th Cir. 2004)(Absolute difference of 9.4 percent does not establish substantial under-representation), citing *United States v. Maskeny*, 609 F.2d 183, 190 (5th Cir.), *cert. denied*, 447 U.S. 921, 100 S. Ct. 3010, 65 L. Ed. 2d 1112 (1980)(less than 10 percent disparity insufficient to warrant relief). The same would be true of the alleged disparity in *gender* representation which petitioner claims occurred in the selection of the grand jury foreperson. The grand jury forepersons selected over the thirteen year period potentially consisted of 17 women (11 known to be females and 6 unknown but possibly female) out of 31, yielding a percentage of female grand jury forepersons of approximately 55 percent compared to a registered voter pool of 57 percent females. The 2 percent absolute disparity would again be insufficient to establish substantial under-representation. Although the court recognizes that it is unlikely that all six of the unknown selected forepersons were black or female, the fact remains that petitioner cannot prove under-representation with such incomplete evidence.

Next, Lindsey asserts that the indictment was invalid because it was handed down by a grand jury empaneled pursuant to a Louisiana law, La. C.Cr. P. art. 413(C), which was later declared unconstitutional by the Louisiana Supreme Court as a prohibited "local law."  Lindsey cites *State v. Dilosa*, 848 So.2d 546 (La. 2003), in which the Louisiana Supreme Court held, *inter alia*, that the provisions of Louisiana law which established a unique method for the selection of the grand jury venire and the foreperson in Orleans Parish violated the Louisiana Constitution's prohibition against the passage of local laws concerning criminal actions. *Dilosa,* however, was based on the *Louisiana Supreme Court's* finding that certain articles of the Louisiana Code of Criminal Procedure violated the *state* constitution, which is of no moment in a federal proceeding.  See *Morrison v. Cain,* 2007 WL 4114345 at \*14 (E.D. La. Nov. 16, 2007) (Feldman, J.);  *Parker v. Cain*, 445 F. Supp. 2d 685, 697 (E.D. La. 2006) (Duval, J.); *Varnado v. Cain*, 2004 WL 2984804 at \*5 (E.D. La. Dec. 21, 2004) (Duval, J.).  Federal habeas corpus relief may be granted only to remedy violations of the U.S. Constitution and laws of the United States; mere violations of state law will not suffice.  28 U.S.C. §2254; *Engle v. Isaac*, 456 U.S. 107, 119 (1983).  See also *Davis v. Jones*, 2006 WL 1540114 (E.D. La. May 31, 2006) (Berrigan, J.)(holding that *Dilosa* "did not announce a new constitutional right under the United States Constitution.  Rather...a *state* supreme court applied a pre-existing *state* constitutional

right to invalidate a state law". The court therefore denied habeas relief.)

To the extent Lindsey suggests that he is entitled to federal review under the standards set forth in *Campbell v. Louisiana*, 523 U.S. 392 (1998), he is not. In *Campbell*, the Supreme Court addressed a Louisiana statute which was not applicable to Orleans Parish. Prior to *Campbell*, La.Code Crim. P. art. 413(B) provided:

> In parishes other than Orleans, the court shall select one person from the grand jury venire to serve as foreman of the grand jury. The sheriff shall draw indiscriminately and by lot from the envelope containing the remaining names on the grand jury venire a sufficient number of names to complete the grand jury.

La.Code Crim. Proc. art. 413(B) (emphasis added) (prior to amendment by Acts 1999, No. 984, § 1, approved July 9, 1999). Thus, under the pre-July 1999 law in Louisiana, the judge selected the foreperson from the grand jury venire before the remaining members of the grand jury have been chosen by lot. As a result, when a foreperson was selected, the judge also selected one member of the grand jury outside of the drawing system used to compose the balance of that body. These considerations required the court in *Campbell* to treat the case as one alleging discriminatory selection of grand jurors. See *Campbell*, 523 U.S. at 396. The Louisiana legislature amended Article 413(B) in July 1999, providing instead for random selection of the foreperson from among the already impaneled grand jury members. La.Code Crim. Proc. art. 413(B)

(as amended by Acts 1999, No. 984, § 1).

Lindsey's case is clearly distinguishable from *Campbell* as *Campbell* addressed a statute which was not the basis of the grand jury selection process in Orleans Parish under La. Code Crim. P. art. 413(C). Moreover, since the United States Supreme Court has never addressed the issue brought under *Dilosa* with regard to Orleans Parish grand jury selection, Lindsey cannot show that he is entitled to relief as he cannot show that the state courts' denial of his claim was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States. See 28 U.S.C. § 2254(d)(1).

Finally, petitioner contends that the indictment should have been quashed as there was "improper exclusion of qualified individuals from eligibility to serve on the grand jury". Petitioner is complaining that individuals were excluded from the grand jury allegedly based on their arrest and/or conviction records. Lindsey offers no evidence in support of his claim that grand jurors were improperly excluded other than to point to the testimony offered again in the state district court *Fleming* case. [42] But the (two) witnesses who testified in the *Fleming* case regarding improper exclusion

---

[42]Interestingly, the issue of grand jury exclusion based upon arrest and/or conviction records was pretermitted in *Fleming* as the district court granted relief on the defendants' challenge to the grand jury and grand jury foreperson selection process based upon race and gender. See discussion in the Louisiana Fourth Circuit's opinion in *State v. Fleming*, 846 So.2d 114, 130 n. 8.

27

were testifying as to what had occurred with the grand jury selection in Fleming's (and co-defendant Trainor's) case itself and that individualized evidence offers nothing to support a claim of improper exclusion in Lindsey's particular case. The record also offers nothing to support Lindsay's conclusory claim. Lindsey's challenge to the grand jury and grand jury foreperson selection process based upon the exclusion of individuals with criminal records and/or arrest records fails to warrant habeas relief.

CLAIM #2: SUFFICIENCY OF INDICTMENT

Lindsey's second claim in his habeas petition is that the grand jury indictment was invalid because it failed to allege the essential elements of the charged offense of second degree murder.[43] A deficient indictment will provide basis for federal habeas relief if the defect is so significant that the convicting court lacked jurisdiction under state law. *Nethery v. Collins*, 993 F.2d 1154, 1157 (5th Cir. 1993); *Yohey v. Collins*, 985 F.2d 222 (5th Cir. 1993); *Morlett v. Lynaugh*, 851 F.2d 1521 (5th Cir. 1988), *cert. denied*, 489 U.S. 1086 (1989). A claim of insufficiency of indictment is valid for federal habeas only when the indictment is so defective that there are no circumstances under which a valid state conviction could result from the facts provable under the indictment. *Yohey*, supra; *Morlett*, supra.

_____

[43]*See* Rec. Doc. 4, Petition at p. 9; Rec. Doc. 32, Traverse to State's Response to Habeas Corpus Petition, p. 11.

The indictment against the petitioner in the instant case is in accordance with the form set out under La.C.Cr.P. art. 462 and La.C.Cr.P. art. 465(A)(32).[44] Additionally, Louisiana law allows the use of short form indictments, *State v. Bourque*, 622 So.2d 198 (La. 1993), and permits a defendant in a criminal proceeding to file a motion requesting a Bill of Particulars setting forth the specifics of the charge alleged in the indictment.[45] Petitioner was therefore fairly apprised of the nature of the charge against him and was not prejudiced in his ability to present a defense because of an insufficient indictment.

Petitioner also asserts that the alleged defect in the grand jury indictment is a jurisdictional defect.[46] Lindsey cites *U.S. v Cabrera-Teran*, 168 F.3d 141 (5th Cir. 1999), which held that failure of an indictment to allege an essential element was a jurisdictional defect. However, in *U.S. v. Longoria*, 298 F.3d 367 (5th Cir. 2002), the Fifth Circuit recognized that *U.S. v. Cotton*, 122 S.Ct. 1781 (2002), overruled *Cabrera-Teran* and held that a defective indictment will not deprive a court of jurisdiction. Thus, petitioner's jurisdictional argument is also without merit. Lindsey has not shown that the state court's denial on this claim amounts to a violation of

---

[44]*See* State Rec. Vol. 3, Grand Jury Indictment of Clemon Lindsey.

[45]*See* La.C.Cr.P. art. 484.

[46]*See* Rec. Doc. 4, Petition at pp. 10-13; Rec. Doc. 32, Traverse to State's Response to Habeas Corpus Petition, p. 12.

federal law. Petitioner's second claim does not justify federal habeas relief.

CLAIM #3:  FALSE TESTIMONY

In his petition, Lindsey argues that the State offered false testimony at his trial and allowed it to remain uncorrected.[47] The Supreme Court has held that a state denies a criminal defendant due process when it knowingly uses perjured testimony at trial or allows untrue testimony to go uncorrected. *Napue v. Illinois*, 360 U.S. 264, 269, 79 S. Ct. 1173, 1177, 3 L. Ed. 2d 1217 (1959); *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 79 L. Ed.2d 104 (1972); *Faulder v. Johnson*, 81 F.3d 515, 519 (5th Cir.), *cert. denied,* 519 U.S. 995, 117 S. Ct. 487, 136 L.Ed.2d 380 (1996). False testimony for these purposes includes testimony that affects the credibility of a witness. *Napue*, 79 S. Ct. at 1177; *United States v. O'Keefe*, 128 F.3d 885, 893 (5th Cir. 1997). Granting a new trial on the basis of a *Napue* violation is only proper if (1) the statements in question are shown to be actually false; (2) the prosecution knew that they were false; and (3) the statements were material. *O'Keefe*, 128 F.3d at 893-894; *Faulder*, 81 F.3d at 519; *Pyles v. Johnson*, 136 F.3d 986, 996 (5th Cir.), *cert. denied*, 524 U.S. 2338, 118 S.Ct. 2338, 141 L.Ed.2d 707 (1998).

The law is clear that, in order to establish that habeas corpus relief is appropriate

---

[47] *See* Rec. Doc. 4, Petition at pp. 17-18; Rec. Doc. 32, Traverse to State's Response to Habeas Corpus Petition, p. 16.

because of the perjury of a witness, the party seeking such relief has a two-fold burden. First, petitioner must prove that, indeed, perjury was committed and that the perjured testimony was material to his conviction. Second, and of equal importance, the petitioner must prove that the state knowingly used the alleged perjured testimony. *Schlang v. Herd*, 691 F.2d 796 (5th Cir. 1982); *Skipper v. Wainwright*, 598 F.2d 425 (5th Cir. 1979), *cert. denied* 444 U.S 974, 100 S.Ct. 469, 62 L.Ed.2d 389 (1979). Mere conclusory statements do not raise a constitutional issue in a habeas case. *United States v. Jones*, 614 F.2d 80 (5th Cir. 1980), *cert. denied* 446 U.S. 945, 100 S.Ct. 2174, 64 L.Ed.2d 801 (1980); *Mayberry v. Davis*, 608 F.2d 1070 (5th Cir. 1979).

Lindsey complains that the State allowed witness Debra Baptiste to testify falsely that there had been no argument between he and the victim prior to the shooting of the victim. Lindsey claims that the presentation of this "false testimony" violated his right to due process. Lindsey provides no evidence that the State suborned perjury. Nor does the mere fact that Lindsey alleges prosecutorial misconduct entitle him to an evidentiary hearing on the issue. *Smith v. Wainwright*, 741 F.2d 1248, 1260-61 (11th Cir. 1984), *cert. denied* 105 S.Ct. 1853 (1985). "When claims for habeas relief are based on unsupported generalizations, a hearing is not required." *Scott v. United States*, 598 F.2d 392, 393 (5th Cir. 1979).

According to Lindsey, the one incident of false testimony occurred when Debra

Baptiste testified at trial about what she observed on the night that Leroy Baptiste was shot and killed.[48] Her testimony on the witness stand that there was never an argument between Lindsey and the victim, he argues, contradicted the typed, signed statement that she gave the police the night of the crime.[49]

While the Fourteenth Amendment forbids the State from knowingly using, or failing to correct, perjured testimony, inconsistencies developed through trial testimony is not the equivalent to perjury. As indicated above, to demonstrate a due process violation in this regard, petitioner "must prove that (1) a witness for the State *testified falsely*; (2) *the State knew* the testimony was false; and (3) such testimony was *material*." *Hafdahl v. Johnson*, 251 F.3d 528, 532-33 (5th Cir. 2001) (emphasis added). Here, petitioner offers nothing to this court which would indicate that the testimony of witness Debra Baptiste was actually false or that the State knew it to be false.[50]

Moreover, even if this court accepted petitioner's characterization of the evidence as false, petitioner cannot establish that the testimony was material in the

---

[48]*See* Rec. Doc. 32, Traverse to State's Response to Habeas Corpus Petition, p. 17.

[49]*Id.*

[50]State's witness Aaron Clark also testified as an eyewitness to the incident. His testimony at trial also undermined Lindsey's claim that there was an altercation between he and the victim prior to the shooting. See State Rec. Vol. 4, Trial Transcript at p. 84-86.

context of the entire trial. To be considered "material", the court must determine whether there is "any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Kyles v. Whitley*, 514 U.S. 419, 434, 115 S.Ct. 1566, 131 L.Ed.2d 490 (1995); *Blackmon v. Scott*, 22 F.3d 560, 565 (5th Cir.), *cert. denied*, 115 S.Ct. 671, 130 L.Ed.2d 604 (1994). Such reasonable probability results when non-disclosure places the case in a different light so as to undermine confidence in the verdict. *Kyles* at 1566*; O'Keefe*, 128 F.3d at 894. The conclusion that an error did not contribute to the verdict is tantamount to a finding that the error is unimportant in relation to everything else that the jury considered on the issue in question as revealed by the record. *O'Keefe*, 128 F.3d at 894, citing *Yates v. Evatt*, 500 U.S. 391, 403, 111 S.Ct. 1884, 1893, 114 L.Ed.2d 432 (1991). The Fifth Circuit explained:

> It is axiomatic that not every lie is material. Along with other circuits, we have limited material lies to those that occur as a part of the prosecution's case. The prosecution has a duty only to refrain from knowingly presenting perjured testimony and from knowingly failing to disclose that testimony used to convict a defendant was false.

*O'Keefe*, 128 F.3d at 894 (internal quotations and citations omitted).

The testimony of Debra Baptiste was certainly important to the State's case. In particular, her testimony that there was no altercation between the defendant and the victim was relevant to petitioner's asserted defense that he shot the victim in self-

defense. Following Debra Baptiste's testimony on the witness stand, however, the State called Detective Arthur Kaufman to testify about the statement he took from Debra Baptiste. In direct testimony, Detective Kaufman reported that he had taken a statement from Debra Baptiste following the shooting, and that she told him the victim and Lindsey had been in an argument and then there was a shooting.[51] Thus, the jury heard Debra Baptiste's testimony and then it heard Detective Kaufman's testimony about her statement concerning what took place between the victim and the defendant. The State essentially presented two conflicting versions of the incident to the jury. It was within the province of the jury to resolve the disputed testimony. "Mere inconsistencies in testimony by government witnesses does not establish the government's knowing use of false testimony." *Overton v. U.S.*, 450 F.2d 919 (5th Cir. 1971); *United States v. Griley*, 814 F.32d 967, 971 (4th Cir. 1987).

As the Fifth Circuit has directed, the proper place to challenge witnesses is during cross-examination – not collateral review. *See Fuller v. Johnson*, 114 F.3d 491, 496-97 (5th Cir. 1997). While Debra Baptiste's and Detective Kaufman's testimonies were inconsistent with each other, inconsistency does not equate to perjured testimony. More importantly, even characterizing the testimony as false, as petitioner does, he fails to establish that the prosecution attempted to mislead the jury through the

---

[51]State Rec. Vol. 4, Tr. Transcript, p. 94.

presentation of *knowingly* falsified testimony. Petitioner fails to demonstrate that his due process rights were violated by the State's introduction of the cited testimony.

CLAIM #4: BRADY VIOLATION

Similarly, petitioner contends that the State knowingly withheld exculpatory, impeachment material in the form of a police report which indicated that Debra Baptiste told officers that the victim and Lindsey had been involved in a verbal altercation prior to the shooting.[52]

Since the passage of the AEDPA, a federal habeas court may grant a writ of habeas corpus on a mixed question of law and fact, such as whether or not evidence was unconstitutionally suppressed, *see Trevino v. Johnson*, 168 F.3d 173, 184 (5th Cir.), *cert. denied*, 527 U.S. 1056, 120 S.Ct. 22, 144 L.Ed.2d 825 (1999), only if it determines that the state court decision rested on an "unreasonable application" of clearly established Federal law, as determined by the Supreme Court, to the facts of the case. 28 U.S.C. §2254 (d)(1). As the U.S. Supreme Court has instructed that "[u]nder §2254 (d)(1)'s 'unreasonable application' clause...a federal habeas court may not issue the writ simply because the court concludes in its *independent* judgment that the relevant state-court decision applied clearly established federal law erroneously or

---

[52]*See* Rec. Doc. 4 at pp.13-17; Rec. Doc. 32, Traverse to State's Response to Habeas Corpus Petition, p. 13.

incorrectly.  Rather that application must also be unreasonable." *Id.* (emphasis added).

"[S]uppression of evidence favorable to the accused violates the Due Process Clause if the evidence is material either to guilt or to punishment. *Kopycinski v. Scott*, 64 F.3d 223, 225 (5 Cir. 1995), citing *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1197, 10 L.Ed.2d 215 (1963).  Under *Brady* and its progeny, the prosecution is required to disclose to the defense both exculpatory evidence and evidence that would be useful for impeachment.  *Brady*, 373 U.S. at 87, 83 S.Ct. At 1196; *Giglio*, 405 U.S. 150, 92 S.Ct. 763; *United States v. Bagley*, 473 U.S. 667, 675-76, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985).   Thus, to prove a constitutional violation as contemplated under *Brady*, there must be a suppression of evidence which is both favorable to the accused and material to his or her guilt or punishment.

In this case, it is clear from the record and the trial transcript that the police report was not withheld by the State.  In defense counsel's discovery motion he requested that the defense be provided with a copy of the police report.[53]   In the prosecutor's answer to this request he responded that it was provided.[54]  Additionally, during cross-examination of Detective Williams at a pre-trial motion to suppress hearing, defense counsel clearly indicates that he has knowledge of the police report

---

[53]*See* State Rec. Vol. 3, page 196.

[54]*See* State Rec. Vol. 3, page 107.

that petitioner claims was withheld.[55]  Thus, Lindsey's claim that the police report was suppressed is without merit.

Petitioner also claims that the District Attorney should have provided "all reports, supplemental reports and statements by police officers of the following persons: 1)Debra Baptiste 2) Kim Brown and 3) Aaron F. Clark. He claims that statements from Kim Brown, Aaron Clark and Debra Baptiste would have indicated that he and the victim had an argument prior to the shooting.  Further he claims that if defense counsel had the statements, he could have utilized them to impeach the credibility of Aaron Clark and Debra Baptiste.  With regard to Aaron Clark, petitioner does not point to any specific information contained in his statement that would have been vital for impeachment purposes.[56] Also, the record makes clear that counsel was aware that Clark had given a statement to the police thus the statement apparently was not suppressed.[57]  Clark's testimony at trial was generally consistent with Debra Baptiste's testimony. As for Debra Baptiste, for reasons earlier discussed, petitioner cannot establish that her testimony could have been impeached with the police report

---

[55] State Rec. Vol. 4, Transcript of proceedings held June 20, 1997 at p. 35.

[56]The State was unable to provide the court with any written statements of Aaron Clark, Kim Brown or statements of Debra Baptiste (other than that contained in the police report) as the State could not locate the prosecution's file. See Rec. Doc. 47, response number 6.

[57]See State Rec. Vol. 4, Trial transcript at p. 90.

or any other possible statements she may have given, if any, relative to the issue of whether an altercation occurred between petitioner and the victim. The two inconsistent versions of whether an argument preceded the victim's shooting were presented to the jury and the jury made its determination. He also claims that the statement of Kim Brown would have established that she could not identify him as the perpetrator at a line-up, but since defendant's identity as the shooter was not an issue at trial, this evidence would not be considered to be exculpatory.[58] Petitioner fails to establish a *Brady* violation warranting federal habeas relief.

CLAIM #5: INEFFECTIVE ASSISTANCE OF COUNSEL

Petitioner's final claim is that he was denied the effective assistance of counsel, in violation of his Sixth and Fourteenth Amendment rights.[59] Under *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), to prove ineffective assistance of counsel, a defendant must show: (1) that counsel's performance fell below an objective standard of reasonableness and (2) that counsel's deficient performance prejudiced the defendant, resulting in an unreliable or fundamentally unfair outcome of the proceeding. *Strickland*, 466 U.S. at 678-88, 104 S.Ct. at 2064-

---

[58]Petitioner cannot establish that the statement was withheld from counsel. According to the transcript of motion hearings held on June 20, 1997, the prosecution was instructed by the trial judge to allow the defense attorney to look over Kim Brown's statement. See State Rec. Vol. 2, Transcript of motions heard June 20, 1997.

[59]*See* Traverse to State's Response to Habeas Corpus Petition, p. 17.

2065. A failure to satisfy one prong of the *Strickland* test negates the need to consider the other. *Id.* at 697, 104 S.Ct. At 2069.

Petitioner alleges that his trial counsel was deficient for: (1) failing to object to the grand jury selection process and failing to file a pre-trial motion to quash the grand jury indictment; (2) failing to object to the form of the grand jury indictment; (3) failing to obtain available impeachment and exculpatory evidence from the prosecution; (4) failing to investigate and call Kim Brown and Tyrone Lindsey as defense witnesses; (5) failing to obtain copies of written statements of Debra Baptiste, Aaron Clark and the police report by Detective Arthur Kaufman; and (6) failing to impeach Debra Baptiste with her prior statements.

With regard to Lindsey's first claim, he has not established that his trial counsel was deficient. Again, petitioner cites *State v. Dilosa,*[60] the Louisiana Supreme Court case which held the provisions of Louisiana law that established a unique method for the selection of the grand jury venire and the foreperson in Orleans Parish violated the Louisiana Constitution. Defense counsel cannot be found deficient for failing to file a Motion to Quash based on *Dilosa* since this case had not been decided at the time of petitioner's trial.[61]

---

[60]848 So.2d 546 (La. 2003).

[61]*State v. Dilosa* was decided in 2003. Petitioner's jury trial occurred on February 5, 1998.

Petitioner's second claim has been already been addressed. As previously noted, the short form indictment is proper under Louisiana Law. *State v. Bourque*, 622 So.2d 198 (La. 1993). Thus, the indictment against the petitioner in the instant case is in accordance with the form set out under La.C.Cr.P. art. 462 and La.C.Cr.P. art. 465(A)(32). Counsel cannot be deficient for failing to press a frivolous point. *Sones v. Hargett*, 61 F.3d 410 (5th Cir. 1995), citing *Koch v. Puckett*, 907 F.2d 527 (5th Cir. 1990). Petitioner's claim is without merit.

Lindsey's third claim regarding ineffective assistance of counsel has also already been addressed. It is clear from the record that defense counsel did have a copy of the police report that petitioner contends was withheld.[62]

With regard to petitioner's fourth claim, he asserts that defense counsel was ineffective for failing to call Kim Brown and Tyrone Lindsey to testify on his behalf. Petitioner contends that Kim Brown would have testified that she witnessed the shooting but could not identify Lindsey as the shooter. As previously stated, given the fact that petitioner's defense at trial was self- defense and that he himself testified at trial that he shot the victim albeit allegedly in self-defense, identity has never been an

---

[62]Petitioner's claim that the police report was withheld by the prosecution was addressed in a previous section of this Report & Recommendation.

issue in this case and Kim Brown's testimony would have been meaningless.[63] Trial counsel cannot be deficient for failing to call a witness whose testimony would not have added anything to the defense's case. Additionally, an attorney's reasonable strategic choices during representation are virtually unchallengeable, *Strickland*, 466 U.S. at 690-91, 104 S.Ct. at 2066, and there is a strong presumption that counsel's strategy and tactics are "within the wide range of reasonable professional assistance." *Id.* at 689, 104 S.Ct. at 2065.

As to defense counsel's decision not to call Tyrone Lindsey (petitioner's brother) to testify, this choice was well within defense counsel's discretion. According to Lindsey's habeas petition and a purported affidavit attached thereto, Tyrone Lindsey would have testified that he saw Debra Baptiste remove two firearms from the crime scene. Given that a different witness for the defense testified to similar facts, Tyrone Lindsey's testimony would have been merely cumulative.[64] Again, there is a strong presumption that counsel's strategy and tactics are "within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065. Thus, petitioner's fourth claim of ineffective assistance is without merit.

_____

[63]Lindsey admitted to shooting the victim in direct examination. State Rec. Vol. 4, Tr. Transcript at pg. 136.

[64]Tyrone Lindsey's testimony would have been cumulative because defense witness Rodney Caesar testified that he saw a woman remove a revolver from the crime scene. State Rec. Vol. 4, Tr. Transcript at pg. 182.

Lindsey's next claim is that defense counsel was deficient for failing to obtain copies of the written statements of Debra Baptiste, Aaron Clark and the report of Detective Arthur Kaufman. It is unclear from the record whether or not defense counsel had a copy of these statements in his possession. However, if he did not, the defense was obviously aware of the inconsistency in Debra Baptiste's statement to the police and her testimony at trial. The jury heard the inconsistent versions of her account of what occurred during the shooting thus counsel cannot be faulted for the jury deciding to side with the version which supported the State. Counsel also cannot be faulted for failing to acquire the statements of Aaron Clark and Kim Brown when the impeachment value of those statements is unknown and unestablished by Lindsey. Thus, petitioner fails to show that counsel was deficient in his investigation of these witnesses and also fails to show that he was prejudiced by counsel's failure to investigate. Moreover, counsel's representation must be evaluated in its entirety, not just in its isolated parts. The court notes that even after trial, counsel continued to investigate Lindsey's claim that the victim was shot in self-defense, apparently tracking a lead given to him that Earnestine Taylor also had witnessed the incident and could allegedly support petitioner's claim of self-defense. Although this witness ultimately recanted her account of a self-defense shooting some three years after Lindsey's trial, counsel's diligence in providing representation to Lindsey cannot be

ignored.[65]  Petitioner fails to establish that his trial counsel was deficient in the investigation, preparation or presentation of his case.  The State court's decision to deny relief on Lindsey's claims of ineffective assistance is not contrary to U.S. Supreme Court precedent as set forth in *Strickland*.

Having failed to establish any violation of constitutional magnitude, petitioner is not entitled to relief pursuant to Title 28, United States Code, Section 2254.

Accordingly,

RECOMMENDATION

IT IS HEREBY RECOMMENDED that the instant habeas corpus petition be DENIED with prejudice.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within 10 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  *Douglass v. United Services Automobile Association*, 79 F.3d 1415, 1430 (5th Cir. 1996).

---

[65]See State Rec. Vol. 3, supplemental.

New Orleans, Louisiana, this 13th  day of April, 2009.

LOUIS MOORE, JR.

United States Magistrate Judge